PEOPLE v HARGRAVE

1. CONSTITUTIONAL LAW—SELF-INCRIMINATION—SILENCE—COMMENT AT TRIAL—PROSECUTORS—CONTRADICTING ASSERTION.

A defendant's silence in the face of interrogation or accusation may not be used against him at trial except to contradict an assertion by the defendant that he made a statement during interrogation.

2. CRIMINAL LAW—SILENCE OF ACCUSED—COMMENT AT TRIAL—FALSE PRETENSES—ARREST—CUSTODY.

It was improper for a prosecutor to bring out on cross-examination that a defendant remained silent during a criminal investigation of a conspiracy to obtain money by false pretenses in an attempt to show that the defendant did not regard certain gratuities paid to him by another suspected conspirator as proper at the time of an interview with the defendant, even though the defendant was not technically under arrest nor in custody during the interview.

3. APPEAL AND ERROR—RIGHT TO SILENCE—PRESERVING QUESTION.

The Court of Appeals may review an alleged infringement of a criminal defendant's right to remain silent even where counsel has failed to raise proper objection at trial.

4. WITNESSES—DEFENDANT AS WITNESS—RIGHT TO SILENCE—CROSS-EXAMINATION—COMMENT ON SILENCE—JUDICIAL POWERS.

Cross-examination which violates a defendant's right not to have his silence in the face of accusation used against him results in a reversible error where it is offensive to the maintenance of sound judicial process.

Appeal from Oakland, Richard D. Kuhn, J. Sub-

REFERENCES FOR POINTS IN HEADNOTES
[1] 81 Am Jur 2d, Witnesses § 497.
[2] 81 Am Jur 2d, Witnesses § 51.
[3] 81 Am Jur 2d, Witnesses § 515.
[4] 81 Am Jur 2d, Witnesses § 49.

mitted March 1, 1977, at Lansing. (Docket No. 21564.) Decided April 18, 1977.

Phillip N. Hargrave was convicted of conspiracy to obtain money by false pretenses and of obtaining money by false pretenses. Defendant appeals. Reversed and remanded.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *L. Brooks Patterson,* Prosecuting Attorney, *Robert C. Williams,* Chief Appellate Counsel, and *Michael J. Modelski,* Assistant Appellate Counsel, for the people.

*Lavan & Hegarty,* for defendant.

Before: DANHOF, C. J., and T. M. BURNS and J. E. McDONALD,* JJ.

DANHOF, C. J. Defendant was convicted by a jury of conspiracy to obtain over $100 by false pretenses, MCLA 750.157a; MSA 28.354(1), and of obtaining over $100 by false pretenses, MCLA 750.218; MSA 28.415. Defendant was fined $5,000 and sentenced to two years probation on count 1 and sentenced to two years probation, with 90 days to be served in the county jail, on count 2. Defendant now appeals by right, raising four issues, only one of which requires discussion.

Defendant contends that the prosecutor's cross-examination concerning defendant's refusal, during police interviews, to explain certain gratuities paid to him by his codefendant violated defendant's Fifth and Sixth Amendment rights. The gratuities were allegedly paid to defendant in return for his signatures on invoices for materials never delivered by codefendant Kilmer to defend-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

ant's employer. The interviews were conducted for the purpose of inducing defendant to cooperate with the police by formal offers of immunity. The interrogating officer read defendant his *Miranda* rights and the interview was conducted at the security office on defendant's employer's premises.

Defendant did not testify concerning the interviews on direct examination. On cross-examination the prosecutor began questioning defendant closely concerning his refusal to explain the gratuities to Detective Flesher, who conducted the interviews. Defendant testified that when Detective Flesher asked him to explain the gratuities at the September 20, 1973, interview he stated that "I would be glad to cooperate with him in any way I could, but I had a responsibility to my family to talk to my family lawyer in regards to my responsibility and legal rights, and I asked him if he would give me the opportunity to talk to my lawyer regarding this matter". Not satisfied with this response, the prosecutor pressed defendant, asking whether his refusal to explain the gratuities was consistent with his previously professed dedication to his job:

"*Q.* If that was said, do you think that is being a dedicated man, dedicated to his job?

"*A.* I was dedicated, I was very much.

"*Q.* I'm not asking you whether you were, I am asking you if that type of response to a police officer investigating an alleged fraud is in keeping with the impression that you give with being a good company man.

"*A.* Like I told him, I had a responsibility to my wife and kids and they were the most—uppermost thing in my life and then the company.

"*Q.* I understand that.

"*A.* And, to me I had to check counsel and get his advise *[sic]* before I could go any further. I have a responsibility to my wife and my kids.

"*Q.* Let me ask you this, Mr. Hargrave—

"*A.* (Interposing) Yes, sir.

"*Q.* (Continuing) How does that responsibility and it is certainly a very correct responsibility, how does that responsibility interfere with your explaining to Detective Flesher why you received some two thousand dollars in checks?

"*A.* Well, can I state it this way, please.

"*Q.* The only thing I am asking you, if you would be responsive to the question, I want to know how your denial of explaining or refusing to explain to Detective Flesher the checks, how it interferes with your obligations to your family?

"*A.* I have always seen or heard like on television, like everyone else watches television, that people in similar cases like this, they always to seek any legal advice, and that's in the rights that he read me, that you are entitled to this under, you know, this is guaranteed to you.

"*Q.* I understand that."

To the contrary, the prosecutor apparently did not understand that; he persisted in asking defendant how his duty to his family could interfere with his "obligation" to "aid a police official in investigation". Defendant answered that "I thought the rights that he read me intended what they said", and that "my obligation was to provide for my family and he read anything you might say can be used against you, and I don't remember all of the rights on the card or what he read word for word, I understood it, to me what it was at face value".

After defendant admitted that he checked out of work for the day after the interview to seek his attorney's advice, the prosecutor concluded with some pointed questioning:

"*Q.* Was it necessary to check out of work for the rest of the day to do that?

"*A.* Well, I called—

"*Q.* (Interposing) Was it of that immediate necessity?

"*A.* It scared the heck out of me; yes, I have never been up for anything like this, it scares the living pants off me.

"*Q.* But, you hadn't done anything wrong.

"*A.* No.

"*Q.* You had to leave work and go see an attorney right away?

"*A.* I think it would frighten anyone."

Defense counsel failed to object to this line of questioning, except on the ground that the question concerning defendant's reason for refusing to explain the gratuities had been asked and answered.

The people argue on appeal that the cross-examination was proper to impeach defendant's testimony that he was a loyal company man and that he did not believe he had violated company policy by accepting the gratuities, which he had admitted receiving. A defendant's silence in the face of interrogation or accusation may not be used at trial, *People v Dunn,* 46 Mich App 226; 208 NW2d 239 (1973), and a "defendant's refusal to speak during interrogation is admissible only to impeach *his own* inconsistent statements at trial". (Emphasis added.) *People v Graham,* 386 Mich 452, 458; 192 NW2d 255 (1971). *People v Shegog,* 44 Mich App 230, 233–234; 205 NW2d 278 (1972). "The fact that a witness did not make a statement may be shown only to contradict his assertion that he did." *People v Bobo,* 390 Mich 355, 359; 212 NW2d 190 (1973). The record is barren of any such assertion. When Detective Flesher revealed the purpose of the interview by confronting defendant with evidence that he had received gratuities from Kilmer, defendant refused to make any statement

before consulting his attorney, as he was entitled to do.

The prosecutor's cross-examination was improper; he elicited from defendant the facts that he had remained silent and sought counsel when asked to explain the checks. It does not answer to argue that the prosecutor was trying to impeach defendant's testimony that he did not think he had violated company policy by accepting the gratuities. That testimony was not inconsistent with his only statement to Detective Flesher, that he would be glad to cooperate in any way he could, but that he wanted to consult his attorney first. Use of defendant's silence at the interview to show that he did not regard the gratuities as proper at the time of the interview thus falls within the rule in *Bobo;* the fact that a witness did not make a statement may be shown only to contradict his assertion that he did; an assertion not present here.

We recognize that defendant was not technically under arrest nor in custody during the interview. It is obvious, however, that suspicion had focused on defendant. He was summoned to the security office, read his rights, and offered immunity at each interview. "Whether his silence was prior to or at the time of arrest makes little difference—the defendant's Fifth Amendment right to remain silent is constant." *People v Bobo, supra,* at 360. "Manifestly whenever a person is stopped for interrogation by the police, whether technically under arrest or not, the Fifth Amendment guarantees that his silence may not be used against him." *Id,* 361.

Defense counsel's failure to object does not preclude this Court from reviewing an alleged infringement of the constitutional right to remain

silent. *People v Gant,* 55 Mich App 510, 513; 222 NW2d 784 (1974), *People v Miller,* 49 Mich App 53, 61; 211 NW2d 242 (1973). Nor can we conclude that the error was harmless, because it fails to pass muster under the inquiry that must precede that question. In *People v Swan,* 56 Mich App 22, 35; 223 NW2d 346 (1974), this Court said:

"We will find it difficult in the future to believe that prosecutors and police are ignorant of the well-established principle of law which forbids comment upon an accused's silence or that clear violations of the principle arise from inadvertence. Deliberate violations of this rule may lead us to reverse convictions even where evidence might be overwhelming.[1] The prosecutor who comments, or elicits comment, on a defendant's silence thus risks the loss of a perfectly good case for no reason."

Under the circumstances of this case, we find that the prosecutor's cross-examination was "offensive to the maintenance of a sound judicial process". *People v Williams,* 63 Mich App 531, 536; 234 NW2d 689 (1975). See *People v Mobley,* 390 Mich 57, 65; 210 NW2d 327 (1973).

Reversed and remanded.

---

[1] The evidence against defendant was less than overwhelming. The investigation included an audit of codefendant Kilmer's records that consumed 1-1/2 man years, but a search through the invoices signed by defendant that took the people's principal witness "days" produced only five allegedly improper invoices. At trial, Detective Flesher admitted that he had since learned that the materials listed on one of these invoices had in fact been delivered to defendant's employer.